IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS E. CARTER, | ) | CASE NO. 1:14-CV-02056 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Thomas E. Carter ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying his application for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423. This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.  PROCEDURAL HISTORY

On May 18, 2011, Plaintiff filed his application for POD and DIB, alleging a disability onset date of March 22, 2011.  (Transcript ("Tr.") 15.)  The claims were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id.*)  On January 8, 2013, an ALJ held Plaintiff's hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and

testified. (*Id.*) A vocational expert ("VE") and a medical expert ("ME") also participated and testified. (*Id.*) On March 6, 2013, the ALJ issued a partially favorable decision, finding that Plaintiff was under a disability from the alleged onset date of March 22, 2011, through July 1, 2012, but that disability ended on July 2, 2012, due to medical improvement. (Tr. 15.) On July 23, 2014, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1.)

On September 16, 2014, Plaintiff filed his complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 13, 15, 18.)

Plaintiff asserts the following assignments of error: (1) The ALJ erred in evaluating the opinion of Plaintiff's treating physician, Dr. Iannotti; and (2) substantial evidence does not support the ALJ's conclusion that Plaintiff's condition improved after July 1, 2012.

## II. EVIDENCE

### A. Personal and Vocational Evidence

Plaintiff was born in 1966 and was 44-years-old on the alleged disability onset date. (Tr. 79.) He had at least a high school education and was able to communicate in English. (Tr. 26.) He had past relevant work as a laborer. (Tr. 80.)

### B. Medical Evidence[1]

---

[1] The ALJ found Plaintiff disabled as of his alleged onset date, March 11, 2011, until July 1, 2012. (Tr. 15-27.) Plaintiff argues that his disability continued after July 1, 2012. Accordingly, the Court will focus its discussion of the medical evidence on records dated after July 1, 2012.

2

Plaintiff has undergone three shoulder surgeries. On March 22, 2011, orthopedic surgeon Joseph Iannotti, M.D., Ph.D., performed a complex total left shoulder replacement surgery. (Tr. 572-574.) On October 27, 2011, Dr. Iannotti performed revision and reconstruction surgery on Plaintiff's left shoulder. (Tr. 694-695.) In November 2011, after being released from the hospital following his second shoulder surgery, Plaintiff was readmitted for a staph infection in his left shoulder, deep vein thrombosis in his left arm, and a pulmonary embolism. (Tr. 660, 671, 697-699.) By January 2012, Plaintiff's second shoulder surgery appeared to be healing well, but he experienced pain a few times per day, at night, at rest, and with daily activities. (Tr. 1092.) In March 2012, Dr. Iannotti performed a third shoulder surgery. (Tr. 1077.) In surgery, Dr. Iannotti removed Plaintiff's entire shoulder replacement. (Tr. 1077, 1117-1118, 1120.) During this same surgery, orthopedic surgeon Michael Joyce, M.D., removed a shoulder mass that was a benign nerve sheath tumor known as a schwannoma. (Tr. 1080-1084.)

On July 9, 2012, Plaintiff saw Dr. Iannotti with reports of increased shoulder pain and decreased range of motion of the left shoulder, as well as aching discomfort of the right shoulder due to overuse. (Tr. 924.) Physical examination showed significant drooping and protraction of the shoulder blade; significant weakness and atrophy of the upper trapezius; weakness of the lower trapezius; and significant weakness of the supraspinatus and posterior cuff function. (*Id.*) Dr. Iannotti concluded that Plaintiff had "[m]ultiple limitations of function and pain secondary to multiple operative procedures." (*Id.*) Dr. Iannotti further noted:

> [Plaintiff] is unable to use this arm for any lifting, reaching,

3

> pushing, or pulling activities. He can use the hand and wrist at waist level for occasional driving and manipulation of his hand and wrist for non-stressful activities at waist level. These are permanent limitations of function. It is unlikely that his symptoms will remain stable over the course of his life and it is highly probable that over the long term, these problems will worsen.

(*Id.*) Dr. Iannotti instructed Plaintiff to "decrease activity level." (*Id.*)

During Plaintiff's July 9, 2012, visit with Dr. Iannotti, Dr. Iannotti completed a medical source statement describing Plaintiff's limitations. (Tr. 922.) Dr. Iannotti reported that Plaintiff could stand for two hours at a time and for two hours total in an eight-hour workday; and sit for 60 minutes at one time and for a total of two hours in an eight-hour day. (*Id.*) He further opined that Plaintiff could lift and carry up to five pounds frequently; occasionally stoop, balance, finger, and handle; reach frequently with the right arm but never reach with the left arm; and occasionally operate a motor vehicle and tolerate heat, but should never work around dangerous equipment, tolerate cold, or tolerate exposure to dust, smoke, or fumes. (*Id.*) Dr. Iannotti opined that Plaintiff would need to elevate his legs for two hours during an eight-hour workday and lie down for two hours during an eight-hour workday. (*Id.*) He noted that Plaintiff had pain that was extreme and was a result of the resection of his arthroplasty and the removal of a schwannoma from his shoulder. (Tr. 923.) Dr. Iannotti opined that Plaintiff's pain medication and Coumadin would adversely affect his work performance. (*Id.*) He further noted that Plaintiff's symptoms, including constant severe pain in his left shoulder, would be severe enough to constantly interfere with the attention and concentration needed to perform even simple work tasks. (*Id.*) Dr. Iannotti estimated

4

that Plaintiff would likely be absent from work four or more days per month.  (*Id.*)

On July 30, 2012, Plaintiff saw his treating internist Timothy Bohn, M.D., at the Cleveland Clinic.  (Tr. 972-976.)  Plaintiff complained of ongoing shoulder pain.  (Tr. 972.)  He reported that he experienced irritability and frustration regarding his ongoing shoulder pain.  (*Id.*)  He also reported that he continued his physical activity.  (*Id.*)  Dr. Bohn diagnosed shoulder pain.  (Tr. 973.)

An MRI of Plaintiff's left shoulder from August 22, 2012, indicated status-post removal of shoulder arthroplasty and removal of schwannoma.  (Tr. 1112.)  Muscle atrophy was present.  (*Id.*)  X-ray results from the same date stated: "The patient is status removal of left shoulder arthroplasty.  Unchanged marked remodeling of the glenoid and proximal humorus.  Two screw fragments remain in the glenoid and are unchanged from the prior examination.  No soft tissue gas is seen."  (Tr. 1110.)

In September 2012, Dr. Iannotti noted that Plaintiff continued to have pain in the glenohumeral (shoulder) area but most significant pain in the periscapular region (around the shoulder blade).  (Tr. 1042.)  Dr. Iannotti recommended chronic pain management as Plaintiff's best option.  (*Id.*)

On October 1, 2012, Plaintiff saw Dr. Bohn with reports of significant shoulder pain.  (*Id.*)  Dr. Bohn noted that no further surgical intervention would be helpful and that Plaintiff was using narcotic pain medication only for severe pain and not on a regular basis.  (*Id.*)

On October 25, 2012, Plaintiff saw Manu Mathews, M.D., on a referral from Dr. Iannotti.  (Tr. 1033-1037.)  Dr. Mathews recounted Plaintiff's left shoulder surgical

5

history and current pain: "The pain is constant and [he] has pain at rest. Pain [is] worse with sitting, walking, standing, and weather. Pain is improved with rest and prescription drugs." (Tr. 1034.) Dr. Mathews noted that Plaintiff had to reduce work to 16 hours each week. (Tr. 1035.) He further noted that Plaintiff had a Pain Disability Index score of 44/70, suggesting a moderate-severe functional impairment. (*Id.*) Dr. Mathews reported negative results on straight leg raising tests. (Tr. 1036.) His identified goals for Plaintiff's treatment included pain reduction, functional restoration, mood stabilization, improved coping, and vocational rehabilitation. (Tr. 1037.) Dr. Mathews noted that Plaintiff's prognosis was good. (*Id.*)

On December 10, 2012, Dr. Iannotti completed a second medical source statement wherein he opined that Plaintiff's limitations were virtually unchanged since July 2012. (Tr. 1105-1106.)

**C.     Hearing Testimony**

    **1.     Plaintiff's Hearing Testimony**

Plaintiff was 46-years-old at the time of his administrative hearing. (Tr. 37.) He lived by himself and was able to do his own grocery shopping, cooking, cleaning, and laundry. (Tr. 37, 51-52.) He did not do yard work or house repairs. (Tr. 52.) He drove every day. (Tr. 37.) He went to church services every Sunday morning but was not active in any church activities. (Tr. 53.)

Plaintiff graduated high school and did not have any occupational training. (Tr. 38.) At the time of the hearing, he was working as a front desk clerk in a fitness center for three to four days per week for a total of about 15 to 20 hours. (Tr. 38-39.) Plaintiff

6

testified that much of his time at work was spent standing, but that he sat for about an hour or an hour and a half. (Tr. 38.) He stated that his job accommodated him by not requiring him to do any lifting. (Tr. 39.)

Plaintiff testified that he had three surgeries on his shoulder. (Tr. 40.) The first surgery was a total shoulder replacement in 2011. (*Id.*) He had a second total shoulder replacement in October 2011 because the first one failed. (*Id.*) He testified that a third surgery was performed in March 2012 to remove a benign tumor and two screws that held the shoulder prosthesis together. (Tr. 40-41.) The doctor ended up removing the entire shoulder joint. (*Id.*) Plaintiff testified that he experienced pain in his left shoulder every day for more than half of the day. (Tr. 46.) Plaintiff also testified that he experienced back pain for the past three years. (Tr. 55.) Due to a work injury, he had pain, numbness, and tingling when using his left wrist and hand. (Tr. 48.)

Plaintiff stated that he saw his orthopedic surgeon, Dr. Iannotti, about every four weeks. (Tr. 44.) Plaintiff testified that he last saw Dr. Iannotti two or three weeks before his hearing. (*Id.*) Dr. Iannotti referred Plaintiff to Dr. Mathews, who gave Plaintiff a nerve block and a cortisone shot and also referred Plaintiff to a pain psychologist. (Tr. 45.) Plaintiff stated that he saw his family physician, Dr. Bohn, about once every three months. (*Id.*)

Plaintiff testified that he could open and close his left hand, rotate his wrist, pick up a small object, and tie his shoelaces. (Tr. 48-49.) He did not open doors with his left hand because doing so would cause pain. (Tr. 48.) He stated that he could not raise his left arm to shoulder level, and reaching his arm out was painful. (Tr. 51.) Plaintiff had no problems with range of motion with his right arm and hand, but he had

7

to be careful when lifting because putting strain on his right side hurt his left side. (Tr. 50.) Plaintiff testified that due to his absent shoulder joint, he was limited to lifting up to three pounds with his left arm and about five to 10 pounds on his right. (Tr. 49, 50.) Plaintiff stated that he could sit or walk for about two hours before needing to sit down. (Tr. 49-50.) He kept his left arm as steady as possible when walking on the treadmill. (Tr. 54-55.)

### 2. Medical Expert's Hearing Testimony

Dr. Martin Macklin, a medical expert, testified at Plaintiff's hearing. Dr. Macklin testified that Plaintiff "should be looked at as essentially only having one functional arm in terms of work activity." (Tr. 56.) He opined that Plaintiff could lift about ten pounds maximum with his right arm. (Tr. 57.) Dr. Macklin stated that he did not find any evidence in the record indicating that Plaintiff was restricted in his ability to stand and walk. (*Id.*) Dr. Macklin stated that he did not find any record evidence supporting Dr. Iannotti's opinion that Plaintiff would need to elevate his legs for two hours a day. (*Id.*) Dr. Macklin opined that because Plaintiff was on Coumadin, he would need to stay away from any environment that might expose him to injury. (*Id.*) He further opined that because Plaintiff has had MRSA, he may be unable to work in a health care setting. (*Id.*)

### 3. Vocational Expert's Hearing Testimony

Deborah Lee, a vocational expert, testified at Plaintiff's hearing. The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work experience. (Tr. 63.) The individual would be limited to lifting ten pounds with his

dominant right arm. (*Id.*) He could not perform any lifting with his left, non-dominant arm. (*Id.*) The individual could stand and walk with no difficulty. (*Id.*) The individual should not be exposed to dangerous machinery or other work hazards and should not perform any commercial driving. (*Id.*) The VE testified that the hypothetical individual would be capable of performing such jobs as a telephone solicitor, an appointment clerk, and a gate guard. (Tr. 63-64.)

### III.   STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot,* 905

9

F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2. The claimant has engaged in substantial gainful activity since March 22, 2011, the date the claimant became disabled.

3. From March 22, 2011, through July 1, 2012, the period during which the claimant was under a disability, the claimant had the following severe impairments: congenital bone loss, status post total left shoulder replacement; and lumbar degenerative arthritis.

4. From March 22, 2011, through July 1, 2012, the period during which the claimant was disabled, the severity of the claimant's congenital bone loss, status post left shoulder replacement medically equaled the criteria of section 1.07 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. The claimant was under a disability, as defined by the Social Security Act, from March 22, 2011, through July 1, 2012.

10

6. The claimant has not developed any new impairment or impairments since July 2, 2012, the date the claimant's disability ended. Thus, the claimant's current severe and non-severe impairments are the same as that present from March 22, 2011, through July 1, 2012.

7. Beginning July 2, 2012, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of the impairments listed in 20 CFR part 404, Subpart P, Appendix 1.

8. Medical improvement occurred as of July 2, 2012, the date the claimant's disability ended.

9. The medical improvement that has occurred is related to the ability to work because the claimant no longer has an impairment or combination of impairments that meets or medically equals the severity of a Listing.

10. After careful consideration of the entire record, the undersigned finds that beginning July 2, 2012, the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he is limited to lifting 10 pounds with his dominant arm and hand; he cannot do any lifting with the left, non-dominant arm. He is able to stand and walk with no difficulty. He should not be exposed to dangerous machinery or other work hazards. He should not perform any commercial driving.

11. The claimant is unable to perform past relevant work.

12. Since July 2, 2012, the claimant has been a younger individual age 18-49.

13. The claimant has at least a high school education and is able to communicate in English.

14. Beginning July 2, 2012, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

15. Beginning July 20, 2012, considering the claimant's age, education, work experience, and residual functional capacity, there have been jobs that exist in significant numbers in the national economy that the claimant can perform.

16. The claimant's disability ended July 2, 2012.

(Tr. 18-27.)

## V. LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B. Plaintiff's Assignments of Error

#### 1. The ALJ Erred in Evaluating the Opinion of Plaintiff's Treating Physician, Dr. Iannotti.

Plaintiff maintains that the ALJ erred in assigning less than controlling weight to the opinion of Plaintiff's treating physician, Dr. Iannotti.  On July 9, 2012, one week after the date Plaintiff's disability ended according to the ALJ, Dr. Iannotti completed a medical source statement regarding Plaintiff's physical abilities and limitations.  (Tr. 922-923.)  Dr. Iannotti opined that Plaintiff had the following limitations, among others:

- Plaintiff's symptoms, including constant severe pain in his left shoulder, would be severe enough to constantly interfere with the attention and concentration required to perform even simple work tasks.
- Plaintiff could stand for only two hours and sit for only two hours in an eight-hour workday.
- Plaintiff could lift and carry 0-5 pounds occasionally.
- Plaintiff could handle with both hands occasionally.
- Plaintiff would need to elevate his legs for two hours during an eight-hour workday.
- Plaintiff would need to lie down for two hours during an eight-hour workday.

(Tr. 922.)  In December 2012, Dr. Iannotti completed a second medical source statement wherein he opined that Plaintiff's limitations were virtually unchanged since July 2012.  (Tr. 1105-1106.)   In his hearing decision, the ALJ addressed Dr. Iannotti's July and December 2012 medical source statements and assigned the opinions "some weight." (Tr. 25.)  Plaintiff maintains that the ALJ violated the treating physician rule in assessing Dr. Iannotti's opinions.

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case

13

record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

Here, the ALJ did not err in assigning less than controlling weight to Dr. Iannotti's opinions, as the ALJ adequately explained his reasons for doing so and substantial evidence supports his conclusion.  After summarizing Dr. Iannotti's findings, the ALJ gave "some weight" to the doctor's opinions, explaining:

> The undersigned gives Dr. Iannotti's opinions some weight, however, the limitations appear to be extreme as compared to the claimant's objective medial [sic] evidence and treatment by Dr. Iannotti.  The limitations in standing and/or walking do not appear supported in the record.  Nor does the need to elevate the claimant's legs.  The undersigned has

14

>> accommodated the restrictions on the claimant's left arm in the residual functional capacity.

(Tr. 25.)  Thus, the ALJ explained that Dr. Iannotti's opinions were not entitled to controlling weight, because some of his findings were not supported by objective evidence in the record.  If this were all the ALJ had said about the evidence, the case would require remand.[2]  In this case, however, the ALJ's opinion, taken as a whole, thoroughly evaluates the evidence and indicates the weight the ALJ gave it.  This provides a sufficient basis for the ALJ's rejection of parts of Dr. Iannotti's opinions, and affords this Court the opportunity to meaningfully review the ALJ's opinion.  *See Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-71 (6th Cir. 2006).  In assigning less than controlling weight to Dr. Iannotti's opinions, the ALJ discussed the following evidence, which implicitly rejects some of Dr. Iannotti's opinions regarding Plaintiff's physical limitations, particularly his limitations with regard to Plaintiff's need to lie down and elevate his legs:

- At his hearing, Plaintiff testified that he works as a front desk clerk at a fitness center 15-20 hours per week. (Tr. 18.)  Plaintiff testified that he both sits and stands on the job and that he does not have to do any lifting.  (*Id.*)

- Plaintiff testified that he can clean and dress himself, prepare simple

---

[2]  There is case law supporting the general proposition that an ALJ's broad statement rejecting a treating physician's opinion without giving specific reasons for rejecting it requires remand.  *See Wilson,* 378 F.3d at 545 (finding that the ALJ's "summary dismissal" of the opinion of the claimant's treating physician failed to satisfy the "good reasons" requirement); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss the treating physician's opinion as incompatible with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").

15

- meals, and perform light laundry and dusting. (Tr. 19.) He can drive and shop in stores for light grocery items about once a week. (*Id.*) Plaintiff testified that he enjoys walking on the treadmill. (*Id.*)

- Plaintiff testified that he engages with others by talking on the phone, in person, or on the computer. (Tr. 19.) He goes to church on Sundays, visits his mother and father a couple times a week, and has some friends. (*Id.*)

- The ALJ assigned great weight to the opinion of impartial medical expert Dr. Macklin, who had the opportunity to review Plaintiff's record and listen to Plaintiff's testimony at the hearing. (Tr. 22.) Dr. Macklin testified that Plaintiff equaled Listing 1.07 from the time of his first shoulder surgery through the time of his third surgery. (Tr. 21.) Dr. Macklin opined that Plaintiff would then require 2-3 months to recover from the surgery and a MRSA infection. (*Id.*) He further opined that Plaintiff had only one "good arm," his right arm. (Tr. 25.) Dr. Macklin found that the evidence does not support a restriction with regard to Plaintiff's ability to stand and walk. (*Id.*)

- The ALJ assigned great weight to the opinion of Dr. Spindler, who conducted a psychological evaluation of Plaintiff in September 2011. (Tr. 22.) Dr. Spindler opined, in part, that Plaintiff had the mental ability to maintain a level of attention and concentration that would be sufficient for most job settings. (*Id.*)

- Plaintiff testified that he experienced pain in his left shoulder that ranged from mild to severe, but that most of the time the pain was moderate. (Tr. 23.)

- In October 2012, Dr. Mathews noted that Plaintiff still experienced left shoulder pain but that Plaintiff's prognosis was good. (Tr. 24, 1037.)

- The ALJ gave "some weight" to the opinions of the state agency medical consultants who opined that Plaintiff was capable of a limited range of light work. (Tr. 25.)

Had the ALJ discussed the aforementioned evidence immediately after stating that he was assigning only "some weight" to Dr. Iannotti's 2012 medical source statements, there would be no question that the ALJ provided "good reasons" for giving Dr. Iannotti's opinions less than controlling weight. The fact that the ALJ did not

16

analyze the medical evidence for a second time (or refer to his previous analysis) when rejecting parts of Dr. Iannotti's opinion does not necessitate remand of Plaintiff's case. "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)). *See also Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766, n.6 (1969)).

Plaintiff also argues that the ALJ erred in assigning more weight to Dr. Macklin's hearing testimony than he assigned to Dr. Iannotti's opinions. The ALJ concluded that Plaintiff's condition improved after his surgery, and that his activities of daily living did not support a finding of disability. (Tr. 25.) In making this determination, the ALJ relied in large part on the opinion of Dr. Macklin, who testified, in part, that he did not find any evidence in the record indicating that Plaintiff was restricted in his ability to stand and walk or that Plaintiff would need to elevate his legs for two hours a day. (Tr. 57.) Plaintiff argues that the ALJ stated no reason why Dr. Macklin's interpretation of the medical evidence should overcome Dr. Iannotti's interpretation of the medical evidence. Contrary to Plaintiff's assertion, the ALJ specifically stated that he assigned great weight to Dr. Macklin's opinion because Dr. Mackllin had a chance to review the entire record and listen to Plaintiff's testimony to assess Plaintiff's impairments, and because

17

his opinion was supported by the objective evidence. (Tr. 26.) An ME's testimony constitutes expert medical evidence upon which an ALJ may rely. *See* S.S.R. 96-6p, 1996 WL 374180, at *1 (S.S.A.); *Buxton v. Halter*, 246 F.3d 762, 775 (6th Cir. 2001). Both Dr. Iannotti and Dr. Macklin reviewed the objective medical evidence in rendering their opinions regarding Plaintiff's physical abilities. While Dr. Iannotti opined that Plaintiff needed to elevate his legs for two hours during an eight-hour day and lie down for two hours in an eight-hour day, he offered no objective medical evidence to support that limitation other than Plaintiff's reports of extreme pain. (Tr. 923-924.)

Finally, Plaintiff maintains that the ALJ's explanation for assigning only "some weight" to Dr. Iannotti's opinions "reached only the standing/walking and leg elevation restrictions" and did not address Dr. Iannotti's finding that Plaintiff had extreme pain that would interfere with his ability to maintain attention and concentration. (Plaintiff's Brief ("Pl.'s Br.") 24.) While the ALJ did not expressly acknowledge Dr. Iannotti's opinion that Plaintiff's "constant severe pain in left shoulder" would interfere with his attention and concentration, the ALJ adequately addressed Plaintiff's testimony with regard to his left shoulder pain. (Tr. 25.) Contrary to Dr. Iannotti's opinion that Plaintiff's pain was "extreme," Plaintiff testified that most of the time his pain was moderate. (Tr. 47.) Indeed, Plaintiff rated his pain level at a five or six out of 10. (Tr. 46.) Moreover, the ALJ specifically found that Plaintiff's pain was not as severe as he alleged in light of Plaintiff's testimony that he is able to care for himself, work part-time, and stay physically active. (Tr. 25.) Dr. Iannotti reported in his July 2012 medical source statement that it was Plaintiff's "constant severe pain in left shoulder" that would constantly interfere with his ability to maintain attention and concentration to perform

even simple work tasks. (Tr. 923.) Thus, Dr. Iannotti's opinion was not based on objective medical evidence, but rather on Plaintiff's subjective reports. As the ALJ concluded that Plaintiff's allegations of pain were not fully credible in light of his daily activities, the ALJ did not err in failing to specifically address Dr. Iannotti's opinions with regard to the effect of Plaintiff's pain on his ability to maintain attention and concentration.

Accordingly and for the foregoing reasons, Plaintiff's first assignment of error does not present a basis for remand of his case.

### 2. Substantial Evidence Does Not Support the ALJ's Conclusion That Plaintiff's Condition Improved After July 1, 2012.

Plaintiff argues that the ALJ's decision "contains no evaluation of the impact of claimant's shoulder pain, back pain, and depression on his RFC after the closed period." (Pl.'s Br. 24.) Plaintiff further maintains that the ALJ "made no finding that [Plaintiff's] physical condition, pain, or mental condition improved by July 2, 2012." (*Id.*) Plaintiff's argument is not well taken, as the ALJ did in fact explain why he determined that Plaintiff's disability ended as of July 2, 2012. As discussed in detail above, the ALJ properly gave great weight to the opinion of the medical expert, Dr. Macklin, who testified that Plaintiff's disability ended after he recovered from his third shoulder surgery. (Tr. 60-61.) Dr. Macklin explained that Plaintiff would have required two or three months after his March 2012 shoulder surgery to recover from the surgery and the course of antibiotics he took for his MRSA infection. (*Id.*) Dr. Macklin reviewed Plaintiff's medical record, and determined that after recovering from his surgery, Plaintiff could: lift 10 pounds with his dominant arm and hand and perform no lifting with his left,

19

non-dominant arm; and stand and walk with no difficulty. (Tr. 57.) Dr. Macklin further concluded that Plaintiff should not be exposed to dangerous machinery or other work hazards. (*Id.*) The VE subsequently testified that a hypothetical individual with the limitations described by Dr. Macklin could perform jobs that exist in significant numbers in the national economy. (Tr. 63-64.) The ALJ properly relied on the testimony of the VE to conclude that beginning July 2, 2012, Plaintiff has been capable of making a successful adjustment to work that exists in significant numbers in the national economy. (Tr. 27.)

In addition to Dr. Macklin's testimony and the testimony of the VE, Plaintiff's testimony regarding his pain and his physical capabilities supports the ALJ's conclusion that Plaintiff's disability ended on July 2, 2012. As the ALJ explained in his decision, Plaintiff testified that his pain was usually moderate rather than severe or extreme, and he stated that was able to care for himself, work part-time, and stay physically active. (Tr. 25.) Thus, contrary to Plaintiff's assertion, substantial evidence in the record, as discussed by the ALJ in his decision, supports the ALJ's conclusion that Plaintiff's condition improved after July 2, 2012. Accordingly, Plaintiff's second assignment of error does not present a basis for remand of his case.

## VI. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**

                                            s/ *Nancy A. Vecchiarelli*
                                            U.S. Magistrate Judge

Date: July 15, 2015